**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **LEONARDO GERMAN** | **CIVIL ACTION** |
| **VERSUS** | **NO. 17-11552** |
| **JERRY GOODWIN, WARDEN** | **SECTION: "I"(5)** |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Leonardo German, is a convicted inmate currently housed at the David Wade Correctional Center in Homer, Louisiana.    In May 2009, he was charged with aggravated rape, simple kidnapping, aggravated battery, and aggravated burglary of an inhabited dwelling.[1]    On February 11, 2012, a jury found him guilty of the lesser responsive

---

[1]  State Rec., Vol. 6 of 11, Indictment.

verdict of attempted aggravated rape and guilty as charged on the remaining counts.[2]    His motion for a new trial was denied.[3]    On May 15, 2012, he was sentenced to serve 45 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on count one, four years imprisonment at hard labor on count two, eight years imprisonment at hard labor on count three, and 28 years imprisonment at hard labor on count four, to run consecutively for a total of 85 years imprisonment.[4]

On direct appeal, he asserted the following counseled and pro se assignments of error related to his conviction:    (1) the evidence was insufficient to convict him; (2) the trial court's refusal to grant the motion for continuance denied him the right to a fair trial; (3) the trial court's refusal to appoint him a sanity commission denied him due process; (4) his convictions for attempted aggravated rape, aggravated burglary, and aggravated battery subjected him to double jeopardy; and (5) ineffective assistance of counsel in several respects based on the failure to object to the jury instructions.    On January 22, 2014, the Louisiana Fourth Circuit Court of Appeal affirmed the convictions.[5]    On November 26, 2014, the Louisiana Supreme Court denied his application for writ of certiorari.[6]

---

[2]  State Rec., Vol. 4 of 11, Minute Entry, 2/11/12.

[3]  State Rec., Vol. 4 of 11, Minute Entry, 5/8/12.

[4]  State Rec., Vol. 4 of 11, Minute Entry, 5/15/12.

[5]  *State v. German*, 2012-KA-1293 (La. App. 4 Cir. 1/22/14), 133 So.3d 179; State Rec., Vol. 5 of 11.

[6]  *State v. German*, 2014-KO-0396 (La. 11/26/14), 152 So.3d 897; State Rec., Vol. 5 of 11.

On or about March 6, 2015, German submitted an application for post-conviction relief ("PCR") to the state district court.[7]    In that application, he raised the following 12 claims for relief:    (1) the trial court's refusal to appoint a sanity commission denied him due process; (2) he was denied effective assistance of counsel in failing to present a defense, call witnesses, and challenge the State's case; (3) he was denied effective assistance of counsel based upon his admission while arguing for a continuance that he was not prepared for trial; (4) the State withheld exculpatory evidence under *Brady v. Maryland*; (5) police misconduct in failing to provide him a Spanish interpreter during questioning; (6) the trial judge was biased; (7) the trial court's failure to instruct the jury on "jury nullification" denied him a fair trial; (8) he was denied effective assistance of counsel in failing to have evidence tested and investigate the case; (9) the prosecutor "illegally stacked" the charges against him; (10) prosecutorial misconduct during opening statement related to the State's blood analysis; (11) prosecutorial misconduct during voir dire; and (12) he was denied a fair trial because he was not informed of his right to consular access or assistance as a Cuban national.[8]    On September 3, 2015, the state district court denied his application for post-conviction relief.[9]    His related writ application to the Louisiana Fourth Circuit Court of

---

[7]  State Rec., Vol. 4 of 11, Uniform Application for Post-Conviction Relief.

[8]  The final claim (No. 12) was raised in an amended PCR application submitted on April 3, 2015. State Rec., Vol. 4 of 11.

[9]  State Rec., Vol. 5 of 11, Order denying PCR, 9/3/15.    The lengthy written order did not address claim number 12.

Appeal was denied on January 20, 2016.[10]    The Louisiana Supreme Court denied relief on

August 4, 2017.[11]

On or about October 25, 2017, German filed his federal application for habeas corpus

relief.[12]    His application raises the same 12 grounds for relief he raised on collateral review

in the state courts.    The State's response concedes that the federal application is timely and

that the claims have been exhausted in the state courts.    The State argues that claims 6, 7,

10 and 11 should be rejected as procedurally defaulted and the remaining claims should be

denied on the merits.[13]    German has filed a reply to the State's response.[14]

## Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts

adduced at trial as follows:

> At trial, Richard Mickey Gibbons testified that in April 2009 he owned rental
> properties on Scarsdale Road in Plaquemines Parish. The victim, S.R.,[15]  lived
> in one of Mr. Gibbon's apartments at 137 Scarsdale Road with her fiance. The
> defendant, Mr. German, lived in another of Mr. Gibbon's apartments at 3833
> Highway 39. The two apartments are located at the intersection of Scarsdale

---

[10]    State Rec., Vol. 4 of 11, *State v. German*, 2015-K-1344 (La. App. 4 Cir. Jan. 20, 2016).
The court of appeal found no error in the ruling on eleven of his twelve claims and provided
written reasons denying relief on Claim 12.

[11]    *State ex rel. German v. State*, 2016-KH-0260 (La. 8/4/17), 224 So.3d 366; State Rec.,
Vol. 5 of 11.

[12]    Rec. Doc. 1, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

[13]    Rec. Doc. 8.

[14]    Rec. Doc. 10

[15]    In order to preserve the victim's anonymity, only her initials will be used.

Road and Highway 39, one facing Scarsdale Road and the other facing Highway 39.

Mr. Gibbons testified that, on the evening of April 26, 2009, he received a phone call from S.R.'s fiance that prompted Mr. Gibbons to check in on S.R. at her apartment. When he got to the apartment, Mr. Gibbons saw that windows had been broken out in the door, that the house appeared to have been broken into, and S.R. was nowhere in the apartment. At that time, Mr. Gibbons called the Plaquemines Parish Sheriff's Office.

Deputy Kevin Bryan testified that he responded to a call for service reporting a residential burglary on Scarsdale Road. He spoke with Mr. Gibbons and inspected the residence at 137 Scarsdale Road. Deputy Bryan then asked Mr. Gibbons if he knew where the residents were and Mr. Gibbons stated that the fiance was at work and S.R. was "at the house on the front of the lane." Deputy Bryan and Deputy Craig Hudson went to that location, knocked on the door, and announced "Sheriff's Office." A female opened the door and ran out screaming that the man inside had a gun and was trying to kill her. Deputy Bryan stated that she was hysterical, crying, and shaking. Another deputy was called over for assistance, and the female was escorted across the street and kept behind police units for safety. Following procedures for armed and barricaded individuals, the deputies made notifications to the Sheriff's Office and the Special Response Team (SRT), set up a perimeter around the location, and waited for backup.

Plaquemines Parish Narcotics Agent Ryan Martinez testified that he was a member of the SRT that responded to an incident on April 26, 2009 on Scarsdale Road. He and another SRT member arrived at the scene first and were advised to get on their gear and watch the rear of the residence on Highway 39 to make sure no one fled from the rear of the home. Agent Martinez testified that between 3:00 and 3:30 a.m. he observed an individual, draped with a sheet over his/her head, walking quickly from the residence. Agent Martinez and another SRT member gave loud verbal commands telling the individual to get on the ground and place his hands behind his back. The individual complied and Agent Martinez detained the individual.

During his testimony, Agent Martinez identified defendant as the individual detained on the night of the incident. Agent Martinez testified that he did not advise defendant that he was under arrest, he did not question or attempt to question defendant, and defendant made no statement to him. He did not recall whether defendant was advised of his rights at that time. Defendant was transferred to the custody of one of the uniformed patrol deputies on the

scene.

On the night of this incident, the victim, S.R., gave a written statement to the Plaquemines Parish Sheriff's Office about the events of that night. S.R. also gave an audio-recorded statement to Det. Mary McClendon on April 27, 2009, and she testified at trial. S.R. testified she had lived at 137 Scarsdale Rd. with her fiance in April 2009. She knew defendant as a neighbor, had talked with him in the previous four or five months prior to the incident, and that defendant had given her a ride to the Dollar Store on occasion. S.R. testified that her relationship to defendant never extended beyond neighbors and she never had any sexual relationship with him.

S.R. testified that on April 26, 2009, she was at her apartment and talking on the phone with her fiance at approximately 9:00 p.m. She stated that she heard a loud knock on the door and she called out "Just a minute." She testified that she told her fiance that defendant was at the door and it sounded like he was kicking the door. She stated that she called out to defendant saying "What do you want?" and defendant yelled at her, "Open the door, you bi–––." She called out to defendant saying she was going to call the landlord and ended the call with her fiance. She stated that defendant went around to her other door, (what she considered her front door) broke through the window pane in the door with a gun, reached in and unlocked the door. She testified that defendant came into her apartment with the gun, threw her down, and told her he was going to kill her.

S.R. stated that defendant dragged her out of her apartment through the grass and into one of the nearby unoccupied apartments. She stated that it was dark inside and she could not tell if defendant put her on a bed or couch, and "he just kept beating me and telling me to do things." When asked what defendant was telling her to do, she stated that he told her to "suck his anaconda" referring to his penis. She stated that he told her to open her mouth; defendant pushed the gun into her mouth and chipped her teeth. She stated that defendant told her to bite his neck and his nipples, and she did this so that he would stop hitting her. But defendant did hit her again with the gun and said he would kill her. She testified that she was scared for her life, particularly when she saw him pull back on the gun and heard it click.

S.R. thought the ordeal in that unoccupied apartment lasted about 20 minutes. At some point, defendant took her out of that apartment and stated that he wanted her to go to his truck. But defendant could not find his keys so he took her to his apartment. While in his apartment, she stated that defendant undressed. She testified that she knew defendant had a roommate but he did

not come out of his room. Defendant had gotten another gun, a silver one, and held it to her side while he put the first gun to her mouth and told her to open her mouth. She told him she needed to use the bathroom. She testified that defendant went with her to the bathroom, she pulled down her pants, and he told her to sit there and shut up. Then he hit her with the gun and dragged her back to his room. She stated that he again told her to "suck his anaconda."

At some point, S.R. heard the Plaquemines Parish Sheriff's Office beating on the door and saw a light through the window. She stated that defendant dragged her by the refrigerator right beside his apartment door; defendant put a gun to her side and told her to "Be quiet." She testified that she took a chance to get away from him, ran and opened the door, whereupon an officer grabbed her and took her away from the apartment. She stated she told the officer that defendant had a gun.

During her testimony, S.R. identified several photographs depicting her injuries, taken by Det. McClendon on the day after the attack. She identified her black and bruised eyes, a place where he hit her with the gun behind her ear, a spot where she stated that he burnt her with a cigarette, and a photo of her chipped tooth. Det. Mary McClendon also testified that she personally observed these injuries while taking the photographs. Det. Mary McClendon held an audio-recorded interview with S.R. on April 27, 2009. S.R.'s recorded interview and her written statement from the night of the attack were also introduced at trial. When asked on cross examination if she were making up this story, S.R. replied "No," but she could not explain why no gun or guns were ever found.

Detective Brett Ricks of the Plaquemines Parish Sheriff's Office testified that he responded to the scene on April 26, 2009, originally as a member of the SRT unit. After defendant was taken into custody, Det. Ricks became a designated detective on the scene. Det. Ricks testified that he spoke with the victim at the scene about the sequence of events of the incident and that the victim showed detectives where defendant had taken her. Det. Ricks obtained a consent-to-search from Mr. Gibbons for the apartments at 137 Scarsdale Rd. and 115 Scarsdale Rd.

Det. Ricks identified several photographs taken at the victim's apartment, 137 Scarsdale Rd., at the unoccupied apartment, 115 Scarsdale Rd., and in the areas outside the apartments. One of the photographs depicted a .45 caliber live cartridge that was collected as evidence at 115 Scarsdale Rd. He testified that when they found the cartridge in the unoccupied apartment, they collected it as evidence, "because of what she explained how he racked the weapon back

and stuck it in his [sic] face and told her to suck his di––." He explained that if there was a bullet in the magazine of the gun and the gun was racked back it would have ejected a live cartridge. Det. Ricks also identified photographs of a woman's earring and a red baseball cap on a mattress in the dark, unoccupied apartment. Another photograph depicted what appeared to be blood on the wall by the mattress. Det. Ricks testified that he originally assumed that the blood on the wall was the victim's, though he had not observed any open, bleeding wounds on her that night. When the blood was tested by a crime lab, the blood was identified to be the defendant's.

Det. Ricks also testified that he participated in the interview of defendant on the morning of April 27, 2009. He stated that the interview occurred at the Detective Bureau in Belle Chasse, and Det. Harvey was the lead on the interview.

Det. Patrick Harvey testified that on the evening of April 26, 2009, he was informed by his supervisor that Det. Ricks was conducting an on scene investigation. Det. Harvey stated that at about 2:00 a.m. on April 27, Det. Ricks contacted him and advised that search warrants and arrest warrants were needed in this investigation. Det. Harvey stated that defendant had been taken into custody at 3:24 a.m., before he (Det. Harvey) arrived on scene. Det. Harvey spoke with the victim and walked through the scene with her. Det. Harvey was present when photographs were taken at the scene. Det. Harvey observed the broken windows in the door at the victim's apartment, the interior of the unoccupied apartment, and the victim's injuries.

Later that morning, Det. Harvey returned to the Detective Bureau to conduct an interview with defendant. The interview began at 10:21 a.m. on April 27, 2009, and it was audio recorded and later transcribed. Det. Harvey started the interview by advising defendant of his *Miranda* rights. He asked defendant if he understood his rights, to which defendant responded "Yes." Defendant also responded "Yeah my brother" when asked if he was willing to speak with the detectives and would sign a waiver of his rights before talking with the detectives. Det. Harvey then began questioning defendant about what happened the night before, around 9:30–10:00 p.m.

Defendant stated that "the girl" S.R. would not leave him alone that night. He stated that she got some wine or she bought a bottle of something and drank it at her apartment and then she came over to his apartment drunk. Defendant said that S.R. came over and pushed and hit him at his apartment, and that she wanted defendant to take her to Houston. Defendant stated that he tried to get her to leave but she would not leave him alone. Defendant said he did not cause

any trouble, but that she was like a dog looking for him.

Defendant stated that S.R. wanted to have sex with him and he stated that they had had sex the day before but not the day of the incident. On the night in question, defendant stated that S.R. kept coming over and they argued because he just wanted her to leave him alone. At one point, defendant admitted that he hit S.R. He stated he hit her once with his hand but she had hit him four or five times. When asked if he had been drinking, defendant stated that he and her were drinking together but he was not too drunk. Later in his statement, defendant stated that he drinks about a case of beer every day and that he was drunk that night.

At trial, Det. Harvey testified about defendant's statement. The audio-recorded interview was introduced, along with a transcription of the interview, and the interview was played for the jury. In his statement, defendant denied several times that he owned any type of gun. He stated that his roommate had a brown .22 rifle, but that defendant did not have a gun. At one point, Det. Harvey asked him if defendant ever went to her apartment last night and broke the windows in the door and took her out of her apartment. Defendant stated, "I remember now ... because the front window.. I break the front window." Det. Harvey asked again, "You broke the front window" and defendant responded, "Yeah, while I was there, yeah." Det. Ricks asked defendant why the victim would lie and write a six-page statement about what happened, and he told defendant that the evidence supported what the victim told them. Defendant replied, "Yeah, a bunch she says is right."

Defendant stated over twenty times during the interview that he did not have a gun. Defendant stated that the "old man" had some rifles. Then Det. Ricks said he was talking about a pistol, and defendant finally stated, "Yeah, I got a little pistol somewhere." However, defendant then said it was a .22 pistol and that he had it in Houston. When detectives asked further questions about a gun, defendant began to talk about the police bringing gun charges and asked the detectives if they would help him out. Det. Ricks explained to defendant that, "we can tell the District Attorney's office that you were honest with us. That's all we can do." Soon after that explanation, defendant stated, "I had the gun in my hand throw away." Defendant explained that he did not remember where exactly he threw the gun, but he threw it somewhere in the high grass or wooded area by the apartments. When asked whose gun it was, defendant said he got it from "Jimmy" in St. Bernard who owed him money. Jimmy gave him the gun instead of the money he owed defendant. Defendant stated to Det. Ricks that the gun was like the one he (Det. Ricks) had, to which Det. Ricks replied: "The Glock?" Defendant replied affirmatively. Detectives then had

defendant mark, on a hand drawn sketch of the area where defendant lived, where he had thrown the gun.

At trial, Det. Harvey testified that the detectives were never able to locate a gun in the area where defendant indicated he had thrown the gun. No gun(s) were ever collected as evidence in connection with this case. Det. Harvey stated that the interview with defendant lasted approximately one hour and seventeen minutes. The audio-recorded interview, along with a transcription of the interview, was introduced into evidence and played for the jury.

At the conclusion of trial, the jury returned verdicts of guilty of attempted aggravated rape, guilty of simple kidnapping, guilty of aggravated battery, and guilty of aggravated burglary of an inhabited dwelling.[16]

## Procedural Default (Claim Nos. 5, 6, 7, 10, 11)

In Claim 5, German alleges police misconduct in failing to provide him with an interpreter during questioning.    The state district court on collateral review construed the argument as challenging the validity of his statement that was allowed into evidence at trial after denial of his motion to suppress.    The district court rejected the claim as procedurally barred because he failed to raise the claim on appeal, and (arguably) alternatively denied the claim on the merits.    La. Code Crim. P. art. 930.4 (C).

In Claim 6, he argues that the trial judge was biased against him and continually denied him the ability to present a defense.    The state district court denied the claim as procedurally barred because no objection was made during the trial to the alleged prejudicial statements and he did not raise the claim on appeal.    La. Code Crim. P. art. 930.4 (B), (C).

In Claim 7, he asserts that he was denied the right to a fair trial by the trial court's

---

[16] *State v. German*, 133 So.3d at 185-90 (footnotes in original).

failure to instruct the jury on their full authority and responsibilities as jurors. The state district court denied this claim as procedurally barred because he did not request such a charge and thus failed to raise the issue in the proceedings leading to conviction. La. Code Crim. P. art. 930.4(B).

In Claims 10 and 11, he asserts prosecutorial misconduct in that the prosecutor mentioned misleading blood-analysis results during opening statements and struck prospective jurors during voir dire based on race or ethnicity. The state district court denied these claims as procedurally barred under Louisiana Code of Criminal Procedure articles 930.4(B) and (C), respectively, because he failed to raise the first issue in the trial proceedings and the latter issue on appeal. Upon review of the transcript, however, the Court finds that the procedural bar was erroneously applied with respect to the prosecutorial misconduct blood-analysis claim. The Court therefore rejects the application of the procedural bar as to claim 10 because it rested on an erroneous *factual* determination by the state district court that the claim was not preserved by objection when, in fact, the record shows defense counsel moved for a mistrial on that basis.[17] *See, e.g., Sivak v. Hardison*, 658 F.3d 898, 906-07 (9th Cir. 2011). For this reason, claim number 10 will be addressed on the merits later in this report.

The Louisiana Fourth Circuit ruled that the district court did not err in denying German's application for post-conviction relief on these claims and provided no additional

---

[17] State Rec., Vol. 5 of 11, State District Court Order Denying PCR, p. 9. *See also* State Rec., Vol. 10 of 11, Trial Transcript, pp. 87-89.

reasons in support.    The Louisiana Supreme Court also found the claims procedurally barred under Louisiana Code of Criminal Procedure article 930.4.

The State in response here has argued that the majority of these claims are procedurally defaulted.    To the extent the State's response did not specifically assert procedural default, namely with respect to claim 5, the Court on its own motion will consider that claim procedurally defaulted as well.    In an abundance of caution, German is hereby specifically instructed that this report and recommendation is notice to him that this Court is *sua sponte* raising the issue of procedural default and that he must submit any evidence or argument concerning the default as part of any objections he may file to this report. *Magouirk v. Phillips*, 144 F.3d 348, 358 (5th Cir. 1998).

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment.    *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 260, 262 (1989)).    This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and to federal review of claims that are raised on either direct or habeas review. *Amos*, 61 F.3d at 338.

Procedural default does not bar federal-court review of a federal claim in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar.

*Harris*, 489 U.S. at 263; *Glover*, 128 F.3d at 902.     If a state court applies a procedural bar, but goes on to alternatively address the merits of the federal claim, the claim is still barred from federal review.     *See Harris v. Reed*, 489 U.S. at 264 n. 10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. ... In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.") (citations omitted); *see also Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999).

The state courts relied upon the provisions of Louisiana Code of Criminal Procedure articles 930.4(B) and (C), which provide independent and adequate state-law grounds to bar federal review of these claims.     *See Parks v. Cain*, Civ. Action No. 12–0297, 2014 WL 505329, at *8 (E.D. La. Feb. 6, 2014) (Feldman, J.); *Lewis v. Cain*, Civil Action No. 09-3240, 2010 WL 4363546, at *9 (E.D. La. Aug. 19, 2010) (Chasez, MJ.), *report and recommendation adopted*, 2010 WL 4340795 (E.D. La. Oct. 21, 2010) (Feldman, J.); *Hurd v. Cain*, Civ. Action No. 09-3112, 2009 WL 3063354, at *7 (E.D. La. Sept. 23, 2009) (Lemmon, J.); *Simmons v. Cain*, Civ. Action No. 06–2130, 2008 WL 2185422, at *6 (E.D. La. May 20, 2008) (Berrigan, J.) (finding Article 930.4(B) and (C) independent and adequate to bar trial errors raised on post-conviction that were not raised at trial or on appeal); *Monroe v. Cain*, Civ. Action No. 05–0929, 2006 WL 5507856, at *8 (E.D. La. Oct. 17, 2006) (finding Article 930.4(B) and (C) independent and adequate to bar prosecutorial misconduct claims and others not raised at

13

trial or on appeal), *adopted as modified on other grounds by Monroe v. Cain*, 05–0929, 2008 WL 818968, at *1 (E.D. La. Mar. 24, 2008) (Berrigan, J.).    Here, the state-court ruling was based on Louisiana law setting forth the requirements for preservation and presentation of claims on post-conviction review.    The ruling was independent of federal law and relied strictly on state procedural requirements.

Moreover, the statutory grounds cited above qualify as an "adequate" procedural ground because the state rule is "firmly established and regularly followed."    *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 60 (2009)); *see also Glover v. Cain*, 128 F.3d at 902 (To be considered "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases). State procedural rules enjoy a presumption of adequacy when the state court expressly relies upon them in deciding not to review a claim, and the burden is on the petitioner to demonstrate otherwise.    *Glover*, 128 F.3d at 902; *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999).    The state courts' reasons for dismissal of German's claims were therefore independent of federal law and adequate to bar review of his claims in this Court.

In order to overcome the procedural-default doctrine, German must demonstrate "cause" for the default and prejudice resulting from the default, or show that the federal court's failure to review the defaulted claim will result in a fundamental miscarriage of justice.    *Amos v. Scott*, 61 F.3d at 339 (citations omitted).    To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.    *Murray v. Carrier*,

477 U.S. 478, 488 (1986).    In this case, German has not offered any cause for the default

which would excuse the procedural bar imposed by the Louisiana courts.[18]    The Court's

review of the record does not support a finding that any factor external to the defense

prevented him from raising the claims in a procedurally proper manner.    Nor does the

record reflect any action or inaction on the part of the State which prevented him from doing

so.    "Absent a showing of cause, it is not necessary for the court to consider whether there

is actual prejudice."    *Martin v. Maxey*, 98 F.3d 844, 849 (5th Cir. 1996).

      Finally, German presents nothing other than self-serving assertions to suggest his

actual innocence on the underlying convictions.    To establish a fundamental miscarriage of

justice, a petitioner must provide the court with evidence that would support a "colorable

showing of factual innocence."    *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986); *accord*

*Murray v. Carrier*, 477 U.S. 478, 496; *Glover*, 128 F.3d at 902.    German presents no evidence

to support a claim of actual innocence that would excuse his procedural default.    Thus,

German's defaulted claims are procedurally barred from review by this Court.

### Standards of Review on the Merits

      Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure

---

[18] The Court notes that even if German were to argue that his default should be excused by his appellate counsel's failure to raise the claims on direct appeal, such an assertion would not constitute "cause."    Claims of ineffective assistance of counsel cannot provide cause for the procedural default of another claim if the ineffective-assistance claim itself is procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).    German never raised a claim in state court that appellate counsel was ineffective.    He can no longer do so under Louisiana law.    *State v. German*, 2016-0260 (La. 2017), 224 So.3d 366.

questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1) have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002).    A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent.    *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).    An "unreasonable

application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694.    A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.    *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").    "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Harrington*, 562 U.S. at 102 (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## Analysis

### A.  *Competency Determination*

German contends his due-process rights were violated when the trial court failed to grant his motion for appointment of a sanity commission and conduct an adequate inquiry

regarding his competency to stand trial.    In his federal application, he argues that the trial court should have held a competency hearing because allegedly in the past as a Cuban citizen he was subjected to physical and psychological brutality under the Fidel Castro regime. The trial court denied the defense's eleventh-hour motions for a sanity commission and for a continuance of trial.

On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected the claim under state and federal law, reasoning:

> In his third pro se assignment of error, defendant argues that the trial court's ruling denying the defense motion to appoint a sanity commission to examine defendant prior to trial denied him due process of law. On the morning that the trial was set to commence, February 7, 2012, the trial court heard arguments on the defense motion to appoint a sanity commission filed the day before, on February 6, and an oral motion for a continuance made by defense counsel on the morning of trial.[19]  The trial court denied both motions and gave oral reasons for its ruling. The defense counsel objected to the trial court's ruling, noticed intent to seek writs, and filed a writ application with this Court on the same date. In connection with defendant's writ application, the trial court submitted a *per curiam* detailing its reasons for denying defendant's motion to appoint a sanity commission. This Court denied defendant's writ on the showing made and we now consider this assignment of error in light of the entire record.[20]

> The prosecution of a defendant who lacks mental capacity to understand the nature and object of proceedings against him, or to assist in his defense, violates the right of due process of law. *Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975). "Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant lacks the capacity to understand the proceedings against him or to assist in his defense." La. C.Cr.P. art. 641. Determining a defendant's mental competency to proceed depends on "whether he has sufficient present ability to consult with his lawyer with a

---

[19]    Defendant also assigns error to the trial court's denial of the motion for continuance. We will address that error separately.

[20]    *Supra* note 3.

reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

The issue of mental incapacity to proceed may be raised at any stage of the proceedings; the burden lies with the defendant to establish that he lacks the capacity to understand the proceedings against him and that he is unable to assist with his defense in a meaningful way. *State v. Bickham*, 404 So.2d 929, 934 (La. 1981). Under La. C.Cr.P. art. 642, when the question of defendant's mental capacity is raised, "there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed." However, "[t]he fact that the defendant's capacity to proceed is called into question does not, for that reason alone, require the trial court to order a mental examination of the defendant; rather it must have reasonable grounds to doubt the defendant's capacity." *State v. Robinson*, 92–1057 (La. App. 1st Cir.5/5/95), 655 So.2d 517, 519; La. C.Cr.P. art. 643; *Bickham, supra,* 404 So.2d at 935; *State ex rel. Seals v. State*, 00–2738, p. 5 (La. 10/25/02), 831 So.2d 828, 832.

Defense counsel's motion to appoint a sanity commission cannot rest on mere allegations without supporting evidence to show that a defendant is unable to understand the nature of the proceedings. *Bickham*, 404 So.2d at 935. The determination of whether there are reasonable grounds to doubt a defendant's mental capacity and to order a mental examination lies within the discretion of the trial court and the trial court's determination will not be set aside absent a clear abuse of discretion. *Id.*, 404 So.2d at 934; *State v. Gauthier*, 07–0743, p. 10 (La. App. 4 Cir. 3/12/08), 978 So.2d 1161, 1168.

In the motion to appoint sanity commission, filed on February 6, 2012, defense counsel did not allege any specific facts in support of the motion. In arguments before the trial court, defense counsel stated that, in discussing a possible plea deal with defendant, he became concerned about defendant's ability to understand his sentencing exposure if convicted of the charged offenses or lesser responsive offenses. Defense counsel spoke with defendant, within ten days or two weeks prior to trial, about the possibility of accepting a plea deal. Defense counsel represented to the court that he spoke to defendant for approximately an hour or hour and a half, and he found that defendant had no problem discussing the facts of the case. However, defense counsel also found that defendant was focused on the fact that the State had no gun in evidence and thought he could not be found guilty of any charges involving a gun. Defense counsel stated that he tried to explain to defendant about lesser responsive verdicts that the jury might return and that any of the convictions

19

could result in a considerable sentence of imprisonment, even assuming he was not convicted of the charge of aggravated rape, the most serious offense charged that carries a mandatory life sentence. Defense counsel represented to the trial court that defendant became quiet, and defense counsel perceived this to mean that defendant did not understand the issue of lesser included offenses and the possibility of considerable sentences if found guilty on these charges.

After speaking with defendant, defense counsel contacted the State and inquired whether any of defendant's previous attorneys had raised the issue of defendant's mental capacity to proceed. The State advised defense counsel that neither of defendant's two previous attorneys had raised the issue. At that point, defense counsel decided to file a motion to appoint a sanity commission.

Defense counsel represented to the trial court that he believed filing a motion to appoint a sanity commission pursuant to La. C.Cr.P. art. 642 mandated a halt to the prosecution of the case until the issue of sanity is addressed, a mental examination of defendant is conducted, and defendant's competence to proceed is determined. Defense counsel further represented to the court that, prior to being informed by the State that morning, he did not know that the trial court, within its discretion, may deny a motion for sanity commission if it is not satisfied that there are sufficient and reasonable grounds for such procedure. Defense counsel argued, however, that he had presented sufficient and reasonable grounds for granting the motion to appoint a sanity commission to determine defendant's mental capacity to proceed.

The State argued that defense counsel had not met the burden of showing that defendant suffered from a mental disease or defect that would affect his ability to understand the proceedings against him and participate in his defense. Rather, the State argued, defense had only claimed that defendant did not understand the "reality" of the case against him. The State cast doubt on the claim that defendant could not understand the proceedings against him and suggested that defendant was manipulating the system. The State highlighted several facts regarding defendant's involvement with his own case over the two years prior to the trial date: defendant had made numerous court appearances and never indicated any difficulty in understanding the nature of the proceedings; the trial court had previously found that defendant understood English when it denied his motion to suppress the statement; neither of defendant's prior two defense attorneys had raised the issue of defendant's mental capacity; defendant, on his own behalf, had filed a pro se civil suit in federal court against the District Attorney's Office, the Sheriff's Office, and his first defense counsel; and defendant had written, presumably

in his own hand, subpoenas for certain records, including cell phone and credit card records.

In denying defendant's motion to appoint a sanity commission, the trial court set forth detailed reasons, orally and in a *per curiam*.[21]  The trial court acknowledged that defendant's native language is Spanish and it appointed an interpreter to be present at each trial court hearing after receiving a handwritten letter from defendant, in September 2009, asking the trial court for an interpreter. The trial court also noted that two of defendant's representatives, including his present counsel, spoke fluent Spanish. The trial court then recited the history of defendant's representation by three appointed counsel and one co-counsel and stated that none of the previous defense counsel had raised any concern that defendant was unable to understand or participate in the proceedings against him. The trial court stated that it had observed defendant during several court appearances, observed defendant speaking English to other people, and reviewed several court filings written and submitted by defendant on his own behalf.

The trial court's *per curiam* cited the law and facts upon which it based its decision to deny the appointment of a sanity commission. It cited Louisiana jurisprudence and the Official Revision Comments to La. C.Cr.P. art 643 stating that the ordering of a mental examination as to the defendant's capacity to proceed rests in the sound discretion of the court and there must be sufficient evidence to raise doubt as to such capacity. *See State v. Anderson*, 06–2987, p. 21 (La. 9/9/08), 996 So.2d 973, 992. The trial court also reviewed its own observations and communications with defendant throughout the case proceedings. The trial court found that defendant understood the proceedings against him and had not demonstrated any mental incapacity such that he would be unable to assist in his defense.

In our review of the record, we find no abuse of discretion in the trial court's denial of defense counsel's motion to appoint a sanity commission. The record includes handwritten filings purportedly written and submitted by defendant that demonstrate defendant's active engagement and understanding of the criminal proceedings against him in this case. We have also reviewed the statement given by defendant to the police on April 27, 2009. Prior to making any statements, the detectives read defendant his constitutional rights and asked defendant if he understood those rights. Defendant stated "Yes" and stated "Yeah, my brother" when asked if he was willing to speak with the detectives. Throughout his interview with detectives, defendant answered

---

[21]  The trial court's *per curiam* also addresses its denial of the motion for continuance.

questions in detail about the incident in question. Both Det. Ricks and Det. Harvey testified at the motion to suppress hearing on March 15, 2011, that defendant had no trouble understanding why he was being questioned. During his statement to the detectives, they informed him that the District Attorney's office would make the decision about what charges defendant would face and he indicated that he understood that. Even if defendant may not have grasped the fact that he could still be found guilty on the criminal charges against him without a gun in evidence, such misunderstanding does not by itself provide reasonable grounds to establish mental incapacity to understand the proceedings and assist in his case. Defendant has not shown the existence of any mental defect or disease or any mental incapacity that could affect his ability to understand or assist in the proceedings. *State v. Carter*, 10–0614, p. 22 (La. 1/24/12), 84 So.3d 499, 518. Considering the record before us and the reasoning of the trial court, we find no abuse of discretion in the trial court's judgment denying the appointment of a sanity commission.

We find no merit to this assignment of error.[22]

On collateral review, the state district court likewise rejected the claim, citing the well-reasoned denials by the court of appeal on supervisory review from the trial court's ruling denying the intertwined motion for continuance [23] and motion to appoint a sanity commission and on direct appeal where it was raised as a pro se assignment of error.[24]   The state appellate courts likewise denied relief without additional stated reasons.

As an initial matter, to the extent he claims that the Louisiana state courts violated

---

[22]   *State v. German*, 133 So.3d at 193-96 (footnotes in original).

[23]   Defense counsel made an oral motion to continue on the morning of trial, arguing that he had not prepared for trial over the weekend because he believed there was no opposition to his recently filed motion to appoint a sanity commission, and therefore, the motion would be granted and all proceedings would cease until a sanity commission had completed review.

[24]   *See* State Rec., Vol. 5 of 11, *State v. German*, 2012-K-0169 (La. App. 4th Cir. Feb. 7, 2012).

state law in failing to afford him a competency hearing under Louisiana Code of Criminal Procedure articles 642 and 647, he is not entitled to relief.    Federal habeas corpus relief is not available to correct alleged errors in the interpretation or application of state law.    *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("federal habeas corpus relief does not lie for errors of state law").

To the extent he alleges that the trial court's failure to conduct an appropriate inquiry regarding his competency violated due process, the claim should be denied.    The United States Fifth Circuit has set out the substantive and procedural due-process guarantees with respect to legal competency determinations:

A. The Substantive Right

Constitutional due process requires that trial of an accused may be conducted only when he is legally competent. *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956). In *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court wrote that the test for determining defendant's mental competency depends upon:

(W)hether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceeding against him. *Id*. at 402, 80 S.Ct. at 789.

One who has been convicted may collaterally attack that conviction by proving his incompetency at the time of the trial by a preponderance of the evidence. He is entitled to an evidentiary hearing for that purpose when he makes a showing by clear and convincing evidence to raise threshold doubt about his competency. *Zapata v. Estelle*, 585 F.2d 750 (5th Cir. 1978).

B. The Procedural Guarantee

State procedures must be adequate to insure the right to be tried while competent. *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). A court must sua sponte conduct an inquiry into a defendant's mental capacity

if the evidence raises a bona fide doubt as to the defendant's competency at that time. *Id.*; *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

A "Pate violation is a procedural error by the trial court and it may occur only in the time frame encompassed by the trial itself and immediately related proceedings. . . . It is always open for the defendant to later assert his actual incompetence at trial in a subsequent collateral proceeding, but the substantive claim should not be confused with a defendant's procedural rights under Pate to a hearing whenever a bona fide doubt as to competence surfaces at trial." *Reese v. Wainright*, 600 F.2d 1085, 1093 (5th Cir. 1979); *Zapata v. Estelle*, 588 F.2d 1017 (5th Cir. 1979).

The habeas corpus petitioner's burden to prevail on a Pate violation is different from the one stated above for the substantive claim. The complaint that a Pate procedural guarantee was violated is that, in the light of what was then known to the trial court, the failure to make further inquiry into defendant's competence to stand trial denied him a fair trial. *Drope*, 420 U.S. at 174, 95 S.Ct. at 905. The test is an objective one. *Pedrero v. Wainright*, 590 F.2d 1383 (5th Cir. 1979). The question is: Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense. "While the Supreme Court has not articulated a general standard for the nature or quantum of evidence necessary to trigger a competency procedure, it has focused on three factors that should be considered: the existence of a history of irrational behavior, defendant's demeanor at trial, and a prior medical opinion." *Chenault v. Stynchombe*, 546 F.2d 1191, 1192-93 (5th Cir. 1977), citing *Drope*, 420 U.S. at 180, 95 S.Ct. at 908. Even one of these factors, standing alone, may, in appropriate circumstances, be sufficient "the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope*, 420 U.S. at 180, 95 S.Ct. at 908.

*Lokos v. Capps*, 625 F.2d 1258, 1261-62 (5th Cir. 1980).

To prevail on a procedural due-process claim, German must establish that the trial court ignored facts raising a "bona fide doubt" regarding his competency to stand trial. *See Pate*, 383 U.S. at 384–86. He has not done so. Here, the state trial court found no

sufficient indication that German was incompetent, and thus no basis for a sanity commission evaluation.[25]    German's counsel waited until the day before trial to move for a sanity commission hearing.    In the almost three years the case was pending German had been represented by several different attorneys, none of whom raised any questions with respect to German's competency.    Nor was German's current attorney able to point to specific information or evidence that indicated German was not competent to proceed. Rather, he offered only his observations when discussing a possible guilty plea that German remained steadfast in his erroneous belief that no gun meant no conviction, and counsel "did not perceive that he understood" the jury could still find him guilty of lesser included offenses.[26]    He also offered entirely speculative suggestions that "there's a possibility he does have a competency issue ....    [h]e arrived in this country as a result of the Mariel boatlifts. And from every history perspective that we have, the Mariel boatlift from Cuba was comprised of people that, you know, that Fidel Castro released from jail and insane asylums. We don't have any information. That is the best source we have."[27]    Counsel submitted, "there's a fifty-fifty chance that he is either from jail in Cuba or from an insane asylum in Cuba... [w]e don't know. But certainly, that is an objective reason—basis to find that there is a possibility that—that a competency issue does exist."[28]    In contrast, the State prosecutor

---

[25]  State Rec., Vol. 8 of 11 (Reasons for Order denying Sanity Commission), pp 18-22.

[26]  State Rec., Vol. 8 of 11, p. 4.

[27]  *Id*. at 7-8.

[28]  *Id*. at 8.

relied on specific information that indicated German might be unwilling to accept the reality against him but "understands the system," citing as evidence his handwritten pro se pleadings in his criminal case, his pro se civil-rights lawsuit filed in federal court, and the records from his time spent in Cuba that were made part of his guilty plea proceedings in Texas for a charge of attempted murder of his wife, which showed he was never housed in a mental institution.[29]

Given the defense's complete lack of objective evidence bearing on German's alleged incompetency and only defense counsel's belief that German may not fully grasp the underlying concepts of the charges, the trial court denied the motion for appointment of a sanity commission.   On the record evidence presented, the state courts upheld the trial court's ruling on direct and collateral review, concluding that there was nothing to suggest German was not competent to assist counsel and proceed to trial.   German has not demonstrated that the state court's decision rejecting his due-process claim was contrary to or involved an unreasonable application of federal law, as determined by the United States Supreme Court.    Likewise, the state court's ruling was not based on an unreasonable determination of facts, in light of the evidence presented in the state-court proceeding.    28 U.S.C. § 2254(d)-(e); *Austin v. Davis*, 876 F.3d 757, 778-79 (5th Cir. 2017).    Accordingly, German is not entitled to relief on this claim.

B.  *Ineffective Assistance of Counsel*

German asserts that he was denied effective assistance of counsel for failing to

---

[29]  *Id.* at 9-11.

conduct proper pretrial investigation, call witnesses and present a defense, and appear at trial prepared to proceed based on counsel's admission that he failed to prepare adequately for trial.    German raised these ineffective-assistance-of-counsel claims in his state-court application for post-conviction relief.    The Louisiana Supreme Court determined that German failed to establish that he received ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.    Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense.    *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."    *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e*, deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.    *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.    *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness."

*Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).    Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689.    "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"    *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).    A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.    *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."    *Strickland*, 466 U.S. at 694.    In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*    In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."    *Crockett*, 796 F.2d at 793.

Because the state courts rejected his ineffective-assistance-of-counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state-court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). In fact, the United States Supreme Court has held that, under the AEDPA, federal habeas

corpus review of ineffective assistance of counsel claims must be "doubly deferential" in order to afford both the state court and the defense attorney the benefit of the doubt.    *Burt v. Titlow*, 134 S.Ct. 10, 13 (2013) (citing *Cullen v. Pinholster*, 563 U.S. at 190).    For the following reasons, the state court's determination is neither contrary to, nor an unreasonable application of, clearly established federal law.

German's arguments seemingly focus on the lack of DNA evidence to prove or disprove the rape charge and counsel's actions and omissions with respect to such evidence. He indicates that counsel should have conducted more pretrial investigation and/or had evidence tested.    However, the record shows that counsel conducted adequate discovery and knew that the State did not possess much in the way of solid physical evidence to prove aggravated rape.    The State had no DNA evidence and no gun was ever recovered. Contrary to German's assertions, counsel was actually well-prepared to explore these issues with the State's witnesses on cross-examination, and did in fact question witnesses about (1) not being able to locate a weapon, (2) why the victim was not immediately transported to the hospital, or (3) why more samples were not collected and tested after an alleged rape.[30] The defense had no reason to conduct further testing to challenge the State's minimal physical evidence, and could not have tested evidence or samples that did not exist because they were never collected in the first place.    As the transcript reflects, defense counsel thoroughly and effectively cross-examined the State's witnesses at trial and highlighted the

---

[30]  *See e.g.*, State Rec., Vol. 10 of 11 (Detective Mary McClendon), p. 119; (Detective Brett Ricks), pp. 151-157; State Rec., Vol. 9 of 11 (Detective Patrick Harvey), pp. 254-265.

issues raised by German with respect to the limited nature of the police investigation and testing done in this case.    On habeas review, scrutiny of counsel's performance "must be highly deferential" and the Court will "indulge a strong presumption that counsel's conduct falls within the wide range of objectively reasonable professional assistance."    *Strickland*, 466 U.S. at 689.    Trial counsel need only, as here, have made "reasonable investigations or a reasonable decision that makes particular investigations unnecessary."    *Id.* at 690.

German also alleges that trial counsel failed to subpoena witnesses for trial. However, the United States Fifth Circuit has held that a petitioner's complaints about uncalled witnesses typically are disfavored on federal habeas corpus review of an ineffective-assistance-of-counsel claim because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative.    *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).    Here, German does not identify a single potential witness or offer information that a potential witness may have possessed which would have been beneficial to the defense.    Because German has not presented any evidence to the state courts or this Court that any particular witness would have provided favorable testimony that would have affected the outcome of the proceeding, counsel cannot be deemed ineffective for not calling any witnesses, relying instead on the State's inability to support its case and effective defense cross-examination of the State's witnesses.

German also claims that counsel should have filed a motion to quash the indictment. However, he does not allege an irregularity or defect in the grand jury indictment.    Rather,

he suggests only that defense counsel was ineffective for failing to have the aggravated rape charge dismissed because the State allegedly possessed insufficient evidence (*i.e.*, DNA) to prove the charge.[31]    German misunderstands the nature and purpose of an indictment. *See Holiday v. Stephens*, 587 F. App'x 767, 774 (5th Cir. 2014).    In *Holiday*, the Fifth Circuit explained:

> The Sixth Amendment requires only that a "reasonable construction of the indictment would charge the offense for which the defendant has been convicted." *McKay v. Collins*, 12 F.3d 66, 69 (5th Cir.1994) (citation omitted). This standard should be applied with practical, not technical considerations. *Id.* Thus, the indictment "need not be expressed in any specific terms," but need only include the "essential elements of the offense" under state law. *Id.* (citation omitted).

*Id.* at 774.

Here, the indictment tracked the relevant statutory language and alleged facts necessary to show an offense was committed and to bar a subsequent prosecution for the same offense.[32]    The indictment gave German sufficient notice of the offenses he was

---

[31]  Rec. Doc. 1-1, p. 4.

[32]  *See* La. Code Crim. P. art. 462.    Additionally, Louisiana Code of Criminal Procedure Article 465(A)(39) provides the short form language for aggravated rape:

A. The following forms of charging offenses may be used, but any other forms authorized by this title may also be used: [...]

39. Aggravated Rape or First Degree Rape—A.B. committed aggravated or first degree rape upon C.D.

B. The indictment, in addition to the necessary averments of the appropriate specific form hereinbefore set forth, may also include a statement of additional facts pertaining to the offense charged. If this is done it shall not affect the sufficiency of the specific indictment form authorized by this article.

accused of having committed in order defend against the charges.    As a result, the indictment was sufficient under Louisiana law.    Even if counsel had moved to quash the indictment, the motion would have been denied as meritless.    Counsel's failure to file such a motion therefore did not fall below an objective standard of reasonableness and did not cause German to suffer prejudice.    *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (counsel is not required to make futile motions or frivolous objections); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.").

Finally, German alleges that counsel's statement to the court that he was not prepared for trial, in arguing his motion for continuance, demonstrates that trial counsel was constitutionally ineffective under *Strickland*.    Counsel offered the following explanation as to why he was not prepared for trial:    "So therefore, as I said, once advised of the sanity commission and heard no objection on the other side or any issue contrary to my filing it, I did not prepare further. So as we're standing here today I am not prepared to go to trial and I would be ineffective and I would put it on the Record, as I am right now."    Because he believed that without opposition to his motion for a sanity commission, the trial court had no discretion to deny it and no proceedings could take place until a determination of competency was made, he "stopped working" and "did not prepare... did not shut myself in on the weekend, you know, to prepare for trial."[33]

Although this ineffective assistance claim was not asserted on direct appeal, the court

---

[33]  State Rec., Vol. 8 of 11, Transcript (Feb. 7, 2012), pp. 5-6.

of appeal decided an instructive related claim regarding the refusal to grant the motion for

continuance.    The appellate court carefully reviewed the basis for the request for

continuance and procedural history of the case:

> In the instant case, defense counsel did not file a written motion for continuance but orally motioned the trial court for a continuance on the date set for trial. In his argument for the continuance, defense counsel represented to the court that he did not spend the weekend prior to trial preparing because he believed that his motion to appoint a sanity commission, filed the day before trial, would halt the proceedings and trial could not commence until after defendant's mental capacity was determined. Defense counsel gave a lengthy explanation to the trial court for not being prepared for trial, in which he noted that, on February 2, he had informed the State of his intention to seek a continuance and the State strenuously objected because it had secured its key witness and was ready to proceed to trial. Nonetheless, due to his mistaken belief that filing a motion to appoint a sanity commission would halt the proceedings, defense counsel did not prepare for the set trial date of February 7, 2012.
>
> The State objected to a continuance and argued the current defense counsel, Mr. Labadie, had been aware of the set trial date since December 15, 2011. The State noted that defense counsel was appointed in October, 2011, that the State provided open file discovery, and defense counsel stated that discovery had been satisfied on the date of the motions hearing, December 15, 2011, at which time the matter was set for trial on February 7, 2012. The State acknowledged that it had informed Mr. Labadie that it would ask the trial court for a continuance if it could not locate and secure the victim, S.R., in time for trial. The State then informed defense counsel, on February 2, 2012, that it had located the victim and was ready for trial. The State also noted that Sheriff's deputies had travelled to West Virginia to pick up and transport the victim, S.R., for trial.

In rejecting the claim, the court of appeal ultimately found no evidence that defense counsel

was unprepared:

> The trial court gave oral and written reasons for denying defense counsel's motion for continuance. The trial court noted that the present defense counsel, Mr. Labadie, had appeared in court on December 15, 2011, and stated that all motions had been satisfied and he had no further motions to file. At that time,

the trial court set the case for trial on February 7, 2012, allowing the defense almost two months to prepare. The trial court noted that defense counsel's failure to prepare was primarily based on counsel's misunderstanding of the law pertaining to the appointment of a sanity commission. However, the trial court found that defense counsel had ample time to prepare for trial since he was appointed as counsel in October, 2011.

The record indicates that defense counsel was appointed on October 14, 2011, and he made two court appearances on behalf of defendant prior to the date set for trial. On December 15, 2011, defense counsel appeared with defendant, a pretrial conference was held, and, on motion of the State, the trial was set for February 7, 2012. Defense counsel did not indicate to the trial court at any time, including in his argument on the motion to continue, that he had been prejudiced by any actions by the State. He acknowledged that the State informed him on February 2 that it had secured the presence of its witness for trial, was ready to proceed, and that the State would object to a continuance. Defense counsel represented to the trial court in its oral motion for continuance that he had intended to spend the weekend prior to trial preparing, implying that he could have adequately done so. The only reason defense counsel did not prepare was his mistaken belief that simply filing a motion to appoint a sanity commission would automatically result in a stay of the proceedings. The trial court noted all of defense counsel's arguments in its oral reasons and *per curiam* denying the motion for a continuance.

We further note that defendant, in his appeal, does not contend that any specific prejudice resulted at trial from the denial of the motion for continuance. *From our review of the record, we find no indication that defense counsel was unprepared or uninformed about the case.* Under these circumstances, we find no abuse of discretion in the trial court's denial of defense counsel's oral motion for continuance on February 7, 2012.[34]

On the first day of trial, counsel candidly stated he had not done his normal level of preparation the weekend before trial, and he believed that he was unprepared for trial. Nonetheless, trial counsel was certainly familiar with the facts and the evidence in German's case, having represented him for about five months.    Furthermore, he knew that the case

---

[34]  *German*, 133 So.3d at 197-98 (emphasis added).

was set for trial on February 7, 2012, and he had two months before the trial date to prepare. He was aware that the State had finally located the victim and was opposed to any request for a continuance.    And he knew the trial court retained discretion to deny a continuance. Even assuming, however, that defense counsel's performance was deficient in that he did not review the evidence fully before trial, German still must establish that the deficient performance prejudiced him.    Notably, the state courts found no evidence in the record to indicate that his performance, despite his understandable fears otherwise, was objectively unreasonable.

German does not suggest what defense counsel might have done differently or more effectively had more time been afforded.    He has not alleged specifically how he was deprived of an alleged defense by counsel's lack of additional preparation time, or how additional time to prepare would have changed the outcome.    He cannot establish that with additional preparation he would have built a stronger defense or exposed any other significant weaknesses in the State's case.    The record establishes that defense counsel ably defended German and obtained a conviction on the lesser included offense of attempted aggravated rape.    Thus, German cannot show that but for his counsel's lack of preparation, the result of the proceeding would have been different.

Accordingly, the state court's denial of relief on the claims of ineffective assistance of counsel was not contrary to or an unreasonable application of *Strickland*.    Thus, German is not entitled to federal habeas corpus relief on this claim.

*C.  Suppression of Evidence*

German asserts that the state prosecutor improperly withheld *Brady* material.    He alleges that the "Plaquemine Sheriff's Office and the District Attorney's Office willfully, knowingly and intentionally destroyed, tampered and/or withheld exculpatory evidence from the crime scene."[35]    Essentially, his claim is grounded upon the failure to collect, preserve and test evidence from the rape victim that presumably would have been favorable and exculpatory to the defense.    *See Brady v. Maryland*, 373 U.S. 83 (1963).    However, as this Court has explained:

> "*Brady* does not require the government to conduct a defendant's investigation or to assist in the presentation of the defense's case," *United States v. O'Keefe*, 119 Fed. App'x 589, 592 (5th Cir. 2004), nor does *Brady* "impose an affirmative duty upon the government to take action to discover information which it does not possess." *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975).

*United States v. Hardrick*, Cr. Action No. 10-202, 2012 WL 5301372 (5th Cir. Oct. 25, 2012).

Here, the State disclosed the results of the blood analysis it conducted on the only blood sample collected from the wall of the vacant apartment.    In fact, German concedes the State had no other specimens from the crime scene, or more particularly from the victim; therefore, the State has not suppressed any information.[36]    Even if such evidence had been collected, *Brady* does not require the State to conduct testing for the defense.    *See Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) (holding that no evidence is suppressed when the Government discloses the evidence to the defense but did not do DNA testing).    Nor is

---

[35]  Rec. Doc. 1-1, p. 9

[36]  Detective McClendon explained why no buccal swabs were taken from the victim immediately after the incident.    State Rec., Vol. 10 of 11 (Detective McClendon), p. 119.

there anything to support German's assumption that information collected for a rape kit, had one been performed, would have been favorable or material to the defense.

Accordingly, the state court's denial of relief on this claim was not contrary to or an unreasonable application of federal law, as determined by the United States Supreme Court. He is not entitled to relief on this claim.

    D.   *Prosecutorial Misconduct*

German next claims that the prosecutor engaged in misconduct by intentionally misleading the jury during opening statements when he suggested the evidence would show that the victim's blood was found on the wall of the vacant apartment.    He argues that the prosecutor's statements were untrue, as admitted later at trial when the prosecutor informed the trial court that he had indeed made a mistake, and the analysis showed that the blood belonged to the accused, German.    German contends that "[t]his became a focal point… to inflame the jurors' minds because there was no evidence to the alleged rape, nor even evidence of the alleged beating of the alleged victim, in which a gun was supposed to be used numerous times."[37]

In *Jones v. Butler*, the Fifth Circuit explained that "improper jury argument by the state does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment."    *Jones*, 864 F.2d 348, 356 (5th Cir. 1988).    "The relevant question is whether the prosecutors' comments so infected the

---

[37]  Rec. Doc. 1-1, p. 16.

trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations and quotations omitted); *accord Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988); *Bell v. Lynaugh*, 828 F.2d 1085, 1095 (5th Cir. 1987). The prosecutor's remarks must be evaluated in the context of the entire trial. *Greer v. Miller*, 483 U.S. 756, 765–66 (1987) (citing *Darden*, 477 U.S. at 179); *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985).

A two-step analysis is used when reviewing claims of prosecutorial misconduct. *United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000); *United States v. Lankford*, 196 F.3d 563, 574 (5th Cir. 1999). First, the court must determine whether the prosecutor made an improper remark. *Wise*, 221 F.3d at 152. "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant." *Id.* A habeas corpus petitioner "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks." *Jones*, 864 F.2d at 356; *accord Hogue v. Scott*, 874 F. Supp. 1486, 1533 (N.D. Tex. 1994). That is, a petitioner must demonstrate that the comment rendered his trial "fundamentally unfair," by showing "a reasonable probability that the verdict might have been different had the trial been properly conducted." *Rogers*, 848 F.2d at 609 (footnote and citations omitted). In analyzing whether impermissible comments by the prosecution resulted in the denial of due process, three factors generally are considered: "the magnitude of the prejudicial effect of the remark, the efficacy of any cautionary instruction, and the strength of the evidence of the defendant's guilt." *United*

*States v. Bermea*, 30 F.3d 1539, 1563 (5th Cir. 1994), *cert. denied*, 513 U.S. 1156, 115 S.Ct. 1113, 130 L.Ed.2d 1077 (1995); *United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir. 1994).

On this record, the Court does not find that the prosecutor's comment on the evidence, albeit misleading, when evaluated in the context of the entire trial, rendered German's trial fundamentally unfair. The record reflects that the prosecutor did indeed misstate what the evidence would show during opening statements.[38] The defense was prepared to enter into a stipulation taking the State at its word with regard to the blood analysis it had conducted. The next day, the State learned it had misspoken and disclosed to the trial court that the test showed the blood actually belonged to German.[39] As evidenced by the State's candid admission, the remark was obviously a mistake and certainly not intentional. As the State prosecutor noted, the admitted error reflected poorly on the State as well as the defense. Defense counsel moved for a mistrial, which was denied. The trial court admonished the jury to disregard entirely the prosecutor's erroneous remark during opening statement and informed the jury that the blood was that of the accused, not the victim.[40] The court further instructed that the attorneys' comments during opening statements, in any event, are not to be considered evidence and may not be given any weight in reaching a verdict. The jury was again so charged at the end of trial.[41] Jurors were also

---

[38] State Rec., Vol. 10 of 11, pp. 26-28.

[39] State Rec., Vol. 10 of 11, p. 87.

[40] State Rec., Vol. 10 of 11, pp. 97-99.

[41] State Rec., Vol. 9 of 11, p. 336.

informed that the State and the defense had agreed to enter a joint stipulation that the blood belonged to German.     Here, any possible prejudicial impact the prosecutor's erroneous comment could have had on the trial proceedings was effectively eliminated by the subsequent correction, admonition and joint stipulation.     On this record, it is clear that the comment made at the outset during opening statements had no impact at all on the jury's verdict.     German is not entitled to federal habeas relief on this claim.

Next, he argues that the prosecution vindictively stacked charges against him either because he filed a civil-rights lawsuit, or the State wanted to increase the chance of conviction and possibly manipulate him into pleading guilty.     The state courts rejected this prosecutorial misconduct claim on post-conviction review.

German offers no evidentiary support for the claim; it is clearly based not in fact or reality, but rather, on German's own theoretical and subjective assumptions.     "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file ... generally rests entirely in his discretion."     *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).     German has not shown that the charges against him lacked probable cause.

Nor has he submitted any evidence of vindictiveness in the charging decisions made in this case.     *See United States v. Goodwin*, 457 U.S. 368, 380–81, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982).     German submits it is his "belief that [his] civil rights complaint was the main reason the prosecution engaged in such a misconduct and vindictive prosecution." [42]

---

[42]   Rec. Doc. 1-1, p. 14.

However, German filed his pro se civil lawsuit one year *after* the grand jury indictment in this case was filed.[43]    At no point did the prosecutor increase the original charges set forth in the indictment.    Accordingly, to the extent he argues that the prosecutor improperly charged him with multiple crimes in retaliation or to increase the chance of conviction or induce a guilty plea, his claim is without merit.    *Flores v. Long*, Civil Action No. 13-0169, 2014 WL 2611278, at *5 (C.D. Cal. June 5, 2014) (citing *People of Territory of Guam v. Fegurgur*, 800 F.2d 1470, 1473 (9th Cir. 1986); *see also Price v. Ollison*, 2011 WL 1883999, at *24 (C.D. Cal.) (challenge to prosecutor's charging decision failed when petitioner "provided absolutely no proof to support his claim that the initial charges were improper"), *report and recommendation adopted as modified by*, 2011 WL 1883008 (C.D. Cal. 2011)).    Thus, German is not entitled to relief on this claim.

### E. Double Jeopardy

German's claim of stacking offenses, asserted in the state courts and in his federal application, was also construed as a double-jeopardy claim.    In his federal application, he offers no factual or legal argument in support of this claim.    The state courts denied relief on post-conviction review.    The state district court noted the claim had been addressed on direct appeal, citing Louisiana Code of Criminal Procedure article 930.4 (A).[44]    The appellate courts denied relief without additional stated reasons.

---

[43]    *See German v. Harvey, et al.*, Civ. Action No. 10-1577 "N"(5) (E.D. La. 2010).

[44]    A federal habeas court simply "look[s]-through" the ruling on collateral review and considers the findings on direct appeal where the claims were first litigated.    *Bennett v. Whitley*, 41 F.3d 1581, 1582-83 (5th Cir. 1994).

On direct appeal, German argued in a pro se assignment of error that three of the offenses for which he was convicted violated principles of double jeopardy (i.e. attempted aggravated rape, aggravated battery and aggravated burglary).    The Louisiana Fourth Circuit recognized and applied two double jeopardy tests, the *Blockburger* test and the "same evidence" test. [45]    The court of appeal concluded that "defendant's convictions for attempted aggravated rape, aggravated battery and aggravated burglary did not rely on the same evidence to prove the elements of each offense, and there are additional facts specific to each offense." [46]    The Louisiana Supreme Court denied his application for writ of certiorari.

The Double Jeopardy Clause of the Fifth Amendment protects against:    (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.    *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)).    In *Blockburger*, the United States Supreme Court determined that if each charged offense contains an element that is not contained in the other, the charges are not considered to be the same offense and are not barred under the Double Jeopardy Clause.    *Blockburger v. United States*, 284 U.S. 299, 304,

---

[45]    However, because the Supreme Court has "disclaimed any intention of adopting a 'same evidence' test in double jeopardy cases," *United States v. Felix*, 503 U.S. 378, 386 (1992), a federal habeas court need not apply the "same evidence" test when considering a double jeopardy claim.    *El-Amin v. Cain*, Civ. Action No. 15-1425, 2016 WL 3742175, at *4 (E.D. La. Jul. 13, 2016).

[46]    *State v. German*, 133 So.3d at 202.

52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).    In applying the test, the Court must "compare the criminal statutes at issue and inquire whether each provision requires proof of an additional fact that the other does not."    *United States v. Singleton*, 16 F.3d 1419, 1442 (5th Cir. 1994) (citing *Blockburger*, 284 U.S. at 304); *accord Bias v. Ieyoub*, 36 F.3d 479, 480 (5th Cir. 1994). As the Fifth Circuit explained:

> We apply the *Blockburger v. United States* [, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932),] test to determine whether two different statutes punish the same offense. *Blockburger* requires us to compare the two statutes at issue and ask "whether each provision requires proof of an additional fact which the other does not." If either statute contains no element not also found in the other statute, the statutes "fail" the *Blockburger* test and the defendant may not be punished under both of them "in the absence of a clear indication of contrary legislative intent." Two statutory offenses need not be identical to constitute the same offense for double jeopardy purposes. The *Blockburger* inquiry focuses on the statutory elements of the offenses, not on their application to the facts of a specific case before the court. Thus, the question is not whether *this* violation of [the first statute] also constituted a violation of [the second statute], but whether *all* violations of the former statute constitute violations of the latter.

*Singleton*, 16 F.3d at 1422 (emphasis in original) (footnotes omitted).    For the following reasons, the state court's decision that there was no double jeopardy violation in this case was neither "contrary to" nor an "unreasonable application" of clearly established federal law as determined by the Supreme Court of the United States.    *Carlile v. Cockrell*, 51 F. App'x 483, 2002 WL 31319380, at *1 (5th Cir. 2002).

The indictment in this case charged German with the following:    Aggravated Rape (14:42); Simple Kidnapping (14:45); Aggravated Battery (14:34); and Aggravated Burglary

of an Inhabited Dwelling (14:60(1)).[47]    He was convicted of attempted aggravated rape, simple kidnapping, aggravated battery and aggravated burglary.    The crimes at issue required distinct elements of proof for conviction, that is, each requires proof of an additional fact that the others do not.    As set out in relevant part by the state court of appeal, the criminal statutes provide:

La. R.S. 14:27 defines attempt as follows:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

La. R.S. 14:41 defines rape as follows:

A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.

La. R.S. 14:42 defines aggravated rape as follows:

A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.

(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

---

[47]  State Rec., Vol. 6 of 11, Indictment.

(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

(5) When two or more offenders participated in the act.

(6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.

La. R.S. 14:60 defines aggravated burglary as follows:

Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,

(1) Is armed with a dangerous weapon; or

(2) After entering arms himself with a dangerous weapon; or

(3) Commits a battery upon any person while in such place, or in entering or leaving such place.

La. R.S. 14:33 defines battery as follows:

Battery is the intentional use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid or substance to another.

La. R.S. 14:34 defines aggravated battery as follows:

A. Aggravated battery is a battery committed with a dangerous weapon.

Additionally, Louisiana Revised Statute 14:45 defines simple kidnapping, in pertinent part, as "[t]he intentional and forcible seizing and carrying of any person from one place to another without his consent."    La. R.S. 14:45.

Federal district courts in Louisiana have considered and rejected similar double-jeopardy claims involving convictions for aggravated burglary and aggravated rape, observing that "[a]ggravated burglary requires the unique element of unauthorized entering

of an inhabited dwelling; whereas, aggravated rape requires proof of the unique element of sexual intercourse." *See Tyler v. Cain*, Civ. Action No. 6:15-CV-0824, 2016 WL 4059212, at *9 (W.D. La. Jun. 17, 2016); *Hedgespeth v. Warden*, Civ. Action No. 11-CV-2078, 2015 WL 1089325, at *5 (W.D. La. Mar. 5, 2015).    Each may be distinguished from simple kidnapping based upon those same distinct elements and the fact that simple kidnapping requires forcibly moving an individual without his or her consent from one place to another, which is not a required element of proof for either aggravated burglary or aggravated rape. Aggravated battery does not require proof of any of these unique elements, but rather, the State must prove the intentional use of force or violence committed with a dangerous weapon.    For aggravated burglary, in addition to proving that defendant made an unauthorized entry of the victim's home with the intent to commit a theft or felony, one of the three aggravating circumstances enumerated under Louisiana Revised Statute 14:60 must also be established; one of those circumstances is the commission of a battery. However, under the indictment in German's case, the State made it clear that it was relying on subsection (1) of Louisiana Revised Statute 14:60, that is, being armed with dangerous weapon, as opposed to subsection (3), committing a battery.    The jury charges reinforced the fact that the State was not relying solely on the proof of a battery to support a conviction for aggravated burglary.[48]    Moreover, this Court has addressed and rejected a double-jeopardy claim under similar circumstances involving an aggravated burglary conviction and an aggravated battery conviction.    In analyzing the double jeopardy issue, the Court

---

[48]  State Rec., Vol. 9 of 11, Trial Transcript, pp. 340-41.

reasoned:

> As the Louisiana Fifth Circuit Court of Appeal correctly noted in its opinion, the aggravated burglary statute requires proof of additional facts which the aggravated battery statute does not, and *vice versa*. For example, the aggravated burglary statute requires proof of an "unauthorized entering of any inhabited dwelling, or any structure, water craft or movable where a person is present...." La. Rev. Stat. Ann. § 14:60. The aggravated battery statute does not require such proof. On the other hand, the aggravated battery statute requires proof of an actual battery with a dangerous weapon, La. Rev. Stat. Ann. § 14:34, whereas the aggravated burglary statute does not. Therefore, petitioner's prosecution and convictions for violating both of those statutes did not violate the protections afforded by the federal Constitution's Double Jeopardy Clause.

*Johnson v. Louisiana*, 559 F Supp.2d 694, 709-10 (E.D. La. 2008).

German has not established that the state court's denial of relief on this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.   Accordingly, he is not entitled to relief on the double-jeopardy claim.

*F.   Consular Notification*

German asserts that he was not informed about his right as a Cuban national to contact the Cuban consulate for assistance under Article 36 of the Vienna Convention.   He raised the claim in an amended application for post-conviction relief filed with the state district court.   In that application, he argued that his lawyer should have remedied the Government's (identified by German as the Sheriff's Department, trial court and numerous appointed attorneys) failure to notify him of his right to consular assistance.   However, the district court's order denying post-conviction relief did not address this particular claim. On supervisory writ of review, the court of appeal offered an independent analysis and

written reasons for denying the claim on the merits.    The court of appeal noted that he failed to raise the issue at the trial stage, and thus the claim was procedurally barred. Furthermore, even assuming that a violation of the Vienna Convention occurred because no notice was given, German failed to allege an error rising to the level of a constitutional violation; thus, the claim was not cognizable on post-conviction review as per *Medellin v. Texas*, 552 U.S. 491 (2008).    The Louisiana Supreme Court denied relief without additional stated reasons.    For the following reasons, German has not shown that the state court's determination was contrary to, or involved an unreasonable application of, federal law as determined by the United States Supreme Court.    28 U.S.C. § 2254(d)(1); *Cardenas v. Stephens*, 820 F.3d 197, 201 (5th Cir. 2016); *Alvarez v. Davis*, 09-CV-3040, 2017 WL 4844570, at *33 (S.D. Tex. Oct. 25, 2017).

The Vienna Convention on Consular Relations ("VCCR") "addresses communication between an individual and his consular officers when the individual is detained by authorities in a foreign country."    *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 338 (2006). German refers in particular to Article 36 of the Convention (entitled "Communication and contact with nationals of the sending State"), which addresses "consular officers' access to their nationals detained by authorities in a foreign country."    *Id.*; Vienna Convention on Consular Relations, art. 36(1)(b), Apr. 24, 1963, 21 U.S.T. 77, 1969 WL 97928.[49]    Article 36

---

[49]  Article 36 of the Vienna Convention provides:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officers shall be free to communicate with nationals of the sending State

requires an arresting authority of the receiving State to "(1) inform the consulate of a foreign national's arrest or detention without delay; (2) forward communications from a detained national to the consulate without delay; and (3) inform a detained foreign national of his rights under Article 36 without delay."    *Osagiede v. United States*, 543 F.3d 399, 402 (7th Cir. 2008) (internal quotation marks omitted).    In addition to providing a "cultural bridge" between the foreign detainee and the American legal system, the consulate may also "conduct its own investigations, file amicus briefs and even intervene directly in a proceeding if it deems that necessary."    *Id.* at 403.

---

and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.    21 U.S.T., at 100–101.

*Id.* at 338 n. 1.

German argues that counsel failed to protect or enforce his right to consular notification, which he was afforded under the Vienna Convention, but not provided in this case.    Assuming that German is a Cuban national as he claims, the record demonstrates that consular notification was neither requested by German nor provided by the authorities. However, German first asserted the claimed violation in his application for post-conviction relief filed with the state courts.    As the appellate court observed, the claim was procedurally barred because he made no objection at the trial court level.    *Cardenas v. Dretke*, 405 F.3d 244, 252-53 (5th Cir. 2005); *Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997); *Alvarez v. Davis*, Civ. Action No. 09-CV-3040, 2017 WL 4844570, at *34 (S.D. Tex. Oct. 25, 2017).

Furthermore, even assuming the lack of consular notification violated Article 36 of the Convention, the state appellate court determined it did not give rise to a cognizable constitutional claim for post-conviction relief.    Indeed, the Fifth Circuit has ruled that Article 36 of the Vienna Convention does not create an individually enforceable right. *United States v. Jimenez-Nava*, 243 F.3d 192, 195-98 (5th Cir. 2001).    The Supreme Court has not held otherwise.    As the Fifth Circuit has explained, "[t]he fact that the [Supreme] Court has not found an individually enforceable right means that, under § 2254(d)(1), we cannot grant relief, because such a right is not part of clearly established federal law as determined by the Supreme Court.    Further, this court has repeatedly held that the VCCR does not give rise to individual rights."    *Cardenas v. Stephens*, 820 F.3d at 203 (citing *Rocha v. Thaler*, 619 F.3d 387, 407 (5th Cir.), *clarified on denial of reconsideration*, 626 F.3d 815 (5th

Cir. 2010); *Leal Garcia*, 573 F.3d at 218 n. 19; *Cardenas v. Dretke*, 405 F.3d 244, 253 (5th Cir. 2005); *Medellin*, 371 F.3d at 280; *United States v. Jimenez–Nava*, 243 F.3d 192, 198 (5th Cir. 2001)).   Thus, the state court could not have unreasonably applied clearly established federal law when it rejected German's consular-notification claim.

Finally, German has not shown that he suffered any prejudice by counsel's failure to pursue consular notification.   In support of his ineffective-assistance claim, German relies on *Osagiede, supra.*   German implies that similar to Osagiede's case the consulate's assistance in his matter was necessary due to cultural issues that impacted his legal representation and case investigation.   In *Osagiede*, the court of appeals granted the § 2255 petition of a Nigerian national and remanded his claim that his attorney provided ineffective assistance by not seeking a remedy for violation of his Article 36 rights.   Osagiede raised an ineffective-assistance claim in his pro se motion, arguing that his Article 36 rights were violated and "his lawyer did nothing about it."   *Id.* at 406.   The court of appeals determined that Osagiede came "a long way toward showing that he deserves an evidentiary hearing."   *Id.* at 413.   The Court relied on Osagiede's special need for help in translating and analyzing the wiretap tapes used against him that contained speakers with heavy Nigerian accents, which were difficult to decipher and were not fully analyzed by an expert. *Id.*   The court also noted that a government witness mistook Osagiede for his cousin who could not be located in Nigeria and may have been the man speaking on the tapes.   *Id.*

First, German has failed to establish that *Osagiede* provides "controlling law" for purposes of proving entitlement to federal habeas corpus relief.   The Seventh Circuit's

51

ruling in *Osagiede* is not "clearly established federal law, *as determined by the Supreme Court*," as required under Section 2254(d)(1).    Second, *Osagiede* is clearly distinguishable regardless.    Unlike *Osagiede*, even assuming German's status as a Cuban national entitled him to notice of consular access, he has not shown that he suffered any prejudice by not receiving notice and access under the circumstances.    *Strickland v. Washington*, 466 U.S. at 694; *see*, *e.g.*, *Levya-Martinez v. Cain*, Civ. Action No. 12-2333, 2015 WL 10058333, at *10-11 (W.D. La. Oct. 19, 2015).    He identifies no specific resources that a foreign consulate could have provided him that would have helped his case.    Any existing language barrier was remedied by the presence of interpreters, as German requested.    As the minute entries reflect, the trial court ensured he had an interpreter present on his behalf for all pretrial and trial proceedings.    And his criminal matter did not require any investigative assistance that consular access would have provided, unlike the *Osagiede* case, which involved critical contacts in Nigeria.    Simply stated, there is no indication in this case that the Cuban consulate either would have or could have offered substantial assistance in German's criminal matter.    German offers nothing to show he suffered prejudice because he was not informed of his right to contact the Cuban consulate.    *See Sandoval v. United States*, 574 F.3d 847 (7th Cir. 2009) (denial of motion to vacate was proper where "[o]ther than a language barrier, which was addressed by the use of an interpreter, Sandoval shows no other prejudice he may have faced by not being put in touch with the Mexican consulate"); *Carty v. Quarterman*, 345 F. App'x 897, 905-06 (5th Cir. 2009) (denial of ineffective-assistance claim proper where petitioner failed show that jurists of reason could debate that she has suffered

any actionable prejudice from trial counsel's failure to advise her of her rights under the Vienna Convention on Consular Relations).

German has not established that the state court's denial of relief on this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.   Accordingly, he is not entitled to federal habeas corpus relief on this claim.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that German's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[50]

New Orleans, Louisiana, this __13th__ day of _____March_____, 2018.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[50] *Douglass* referenced the previously applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.